UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,                    CRIMINAL NO. 08-168 (JRT/JSM)

      Plaintiff,

v.                                           <u>REPORT AND RECOMMENDATION</u>

MARCUS DEVON SMITH,

      Defendant.


JANIE S. MAYERON, United States Magistrate Judge

The above matter came on before the undersigned upon defendant Marcus Devon Smith's Motion to Suppress Statements Due to Involuntariness of Statement and Involuntary Waiver of <u>Miranda</u> Rights [Docket No. 14] and Motion for <u>Franks</u> Hearing, or an Evidentiary Hearing Challenging the Truthfulness and Accuracy of the Application in Support of Search Warrant [Docket No. 15].[1]

Leshia Lee-Dixon, Assistant United States Attorney, appeared on behalf of the United States of America; Kassius O. Benson, Esq. appeared on behalf of defendant Marcus Devon Smith, who was personally present.  The matter was referred to the undersigned by the District Court for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b)(1)(B).

Based upon the pleadings, the pre-hearing submissions, exhibits submitted at the hearing on July 1, 2008, and testimony taken from Lt. Dan Davidson, Deputy Anthony Adams, Lt. Nicholas Cesafsky, and Elizabeth Sorgatz, it is recommended that

---

[1]    After the motions hearing on July 1, 2008, defendant filed a Post-Hearing Memorandum in Support of Defendant's Motion to Suppress Evidence Obtained Pursuant to Search Warrant and Motion to Suppress Defendant's Statements [Docket No. 28].  Though not technically filed as a separate motion, the Court considers the motion to suppress evidence in this Report and Recommendation.

defendant Marcus Devon Smith's Motion to Suppress Defendant's Statements [Docket No. 14] be denied, Motion for Franks Hearing [Docket No. 15] be granted, and Motion to Suppress Evidence [Docket No. 28] be denied.

## I.    FACTUAL BACKGROUND

At the hearing, Lt. Dan Davidson of the Blue Earth County Sheriff's Department testified that he was involved in an investigation of defendant Marcus Devon Smith. (Tr. 23).   In April or May of 2007, Lt. Davidson had made a controlled buy from defendant using an informant, at which time he obtained marijuana from defendant. (Tr. 24-25).   The investigation was inactive until November 4, 2007, when Lt. Davidson received new information from a different informant, Brittany Ammerman-Bradshaw. (Tr. 24).   Prior to November 4, 2007, Lt. Davidson had contact with Brittany on two other occasions.   (Tr. 25).   The first time was several years prior, when she was a juvenile, and the second time was some time in October 2007 when she had been arrested for a DWI and he spoke with her about her relationship with defendant.   (Tr. 25-26).

On November 4, 2007, Lt. Davidson was contacted by Detective Gottschalk at the Mankato Police Department, who told him that there were some people at the Law Enforcement Center who wanted to speak with him and would not give anyone else information.   (Tr. 26).   At about 3:15 p.m., Lt. Davidson went to the Law Enforcement Center and saw Brittany with her mother and another individual named Elizabeth Sorgatz.   (Tr. 27, 72).   Brittany told Lt. Davidson that one or two hours earlier she had been at defendant's house and seen him in possession of an amount of cocaine. (Tr. 27, 73).   Brittany indicated that she had an argument with defendant the previous night – they had gotten into a big fight, he had threatened to kill her and he had made statements threatening her.   (Tr. 28-29).   The next morning, Brittany went to confront

defendant at his house and saw him cutting up cocaine or packaging cocaine.  (Tr. 29).

Brittany stated several times to Lt. Davidson  that she saw defendant take cocaine from

one bag, place it in little baggie corners, tie off the baggie corners and place it into

another bag that she described as approximately the size of a softball.  (Tr. 30).  These

statements were all made in the presence of Sorgatz and Brittany's mother.  (Tr. 30).

Lt. Davidson asked Brittany if she had ever been present when defendant was selling

cocaine, and she said that she had.  (Tr. 31).

In order to have more privacy, the three women drove to the Drug Task Force

Office and Lt. Davidson met them there.  (Tr. 31).  When they arrived, Lt. Davidson

continued his interview of Brittany in the presence of Sorgatz and her mother.  (Tr. 31).

Lt. Davidson and Brittany spoke about her ongoing relationship with defendant.  (Tr. 31).

Lt. Davidson testified that he had spoken to Brittany about a month before and warned

her that her ongoing involvement with defendant could cause her problems down the

road.  (Tr. 32).  Lt. Davidson was under the impression that Sorgatz was there as a

source of support for Brittany.  (Tr. 29).  Sorgatz never indicated to him that Brittany was

not telling the truth.  (Tr. 38).

Lt. Davidson then spoke with Brittany alone, at which time they went over her

statement again.  (Tr. 32-33).  Lt. Davidson assumed that Brittany was mad at

defendant because of the argument she had with him the night before.  (Tr. 32, 67-68).

She did not indicate to him that she wanted anything in return for providing the

information regarding defendant, and Lt. Davidson offered nothing for the information.

(Tr. 32, 78).  They did not discuss Brittany's DWI charge or getting her license

reinstated, nor did Lt. Davidson offer any assistance to Brittany with respect to this DWI

change or her license.  (Tr. 32, 55, 60, 61).

After receiving the information provided by Brittany, Lt. Davidson prepared a search warrant for defendant's residence and included the information he had obtained from her in his affidavit, along with information about a previous controlled buy he had made from defendant, and that defendant had been arrested for narcotics violations in the past.  (Tr. 34).  Lt. Davidson also included in his affidavit information that in January 2007, defendant was stopped by a Minnesota State Patrol trooper and was found to be in possession of $3,000, for which he could not account from employment records; when the currency was run through an ion scanner, it spiked high for the presence of cocaine and marijuana and the money was seized at that time.  (Tr. 35).  Lt. Davidson subsequently submitted the search warrant and affidavit to a judge with Blue Earth County, and after receiving the judge's signature, executed the warrant.  (Tr. 35).  See Gov't Ex. 2.

The second paragraph of the affidavit referred to the fact that Brittany had been with defendant numerous times in the past when he was dealing cocaine, and that this went against her penal interest.  Gov't Ex. 2.  Lt. Davidson testified that the basis for including that statement was that Brittany basically admitted to being involved, at least on a minor conspiracy level, to the sale of cocaine.  (Tr. 37).  Lt. Davidson had no reason to question Brittany's information.  (Tr. 69).

Prior to submitting the affidavit to the judge, Lt. Davidson did not run a criminal history on Brittany; he checked her history in-house, but did not run an NCIC criminal history check on her.  (Tr. 38).  At the time, Lt. Davidson was not aware of any pending charges for terroristic threats.  (Tr. 39).  He discovered a charge for terroristic threats that had been filed against Brittany later in November 2007, after he spoke to the attorney who was going to handle the case. (Tr. 39).

4

The warrant was executed at approximately 5:00 p.m. at defendant's residence. (Tr. 40).   Defendant was home with his son, who was two years old.   (Tr. 40). Lt. Davidson was not present when officers first made contact with defendant, but was told he was wearing boxer shorts and a t-shirt.  (Tr. 40).   The officers allowed defendant to get dressed and took him out to a squad car in the parking lot.  (Tr. 40).   After the child and defendant were taken out of the residence, the officers searched it with a canine.  (Tr. 41).   Approximately eight to nine ounces of cocaine and three firearms, two of which were determined to be stolen, were recovered.  (Tr. 41).   The cocaine was packaged in baggies; one of the baggies was approximately the size of a baseball that was filled with what appeared to be crack cocaine tied off in baggie corners.  (Tr. 42). There were a number of other baggies filled with powdered cocaine.  (Tr. 42).

After the residence had been secured and defendant had been taken out to the squad car, one of the deputies remarked to Lt. Davidson that defendant was having a hard time.  (Tr. 42).   Lt. Davidson went to talk to defendant.  (Tr. 42).   Defendant was standing outside of the police car in handcuffs.   (Tr. 62)   Lt. Davidson noticed that defendant was bent forward looking down at the ground and appeared as he was about to vomit.  (Tr. 42).   Defendant was crying; Lt. Davidson could tell he was very upset and when he put his hand on defendant's shoulder, he could feel that defendant was shaking.  (Tr. 42).   Lt. Davidson asked him if he was going to be okay; defendant stated that he was worried about losing his child and then he became very physically ill. (Tr. 42-43).   After defendant vomited, Lt. Davidson told him that the way he was acting, Lt. Davidson thought there was "probably going to be something in his house or cocaine in his house."  (Tr. 64).   Up until that point, defendant had not given any statements involving his possession of cocaine or otherwise, nor had he been administered a

5

<u>Miranda</u> warning.  (Tr. 65).

After his initial conversation with defendant, but before interviewing him at the Law Enforcement Center, Lt. Davidson was advised that defendant had made a statement to Deputy Adams that if they found anything in the house, it belonged to him. (Tr. 43, 67).

By the time Lt. Davidson arrived at the jail, defendant was already there.  (Tr. 43-44).  When Lt. Davidson initially made contact with defendant at the jail, he was seated in an interview room next to the booking area.  (Tr. 44).  Lt. Davidson interviewed him, along with Agent Peterson.  (Tr. 44).  The interview was recorded by Lt. Davidson. (Tr. 44).  Lt. Davidson and Agent Peterson were not wearing firearms.  (Tr. 45).  When they entered the room, defendant was very upset, tearful and looking down at the floor; he appeared to be the same as he was at the scene when Lt. Davidson had contact with him there.  (Tr. 45).  Lt. Davidson informed defendant that they had finished executing the search warrant at his girlfriend's residence and that they had found some cocaine and handguns.  (Tr. 45).  Lt. Davidson then informed defendant that he was under arrest and then gave him his <u>Miranda</u> rights verbally.  (Tr. 45).  Defendant responded that he understood his rights and indicated that he wanted to talk.  (Tr. 46). Lt. Davidson stated that defendant was upset, but seemed like he wanted to take responsibility for what had happened.  (Tr. 47).  During the interview, defendant made several inculpatory statements about the cocaine and guns.  (Tr. 47-48).

The interview lasted approximately ten minutes.  (Tr. 48).  During the interview, Lt. Davidson and Agent Peterson did not say anything to defendant that would have encouraged him to give them a statement.  (Tr. 48-49).

After the interview with defendant, Lt. Davidson had further contact with Brittany, Sorgatz and Brittany's mother back at the Task Force Office.  (Tr. 52).  Lt. Davidson spoke with Brittany's mother alone and told her that they had found what Brittany said would be at defendant's house.  (Tr. 50, 53).  At that time, Brittany's mother indicated that Brittany had been staying with Sorgatz the night before and Sorgatz's windows were broken during the night.  (Tr. 75).  Brittany's mother stated that she suspected defendant had broken the windows of Sorgatz's house and she wanted to know if Lt. Davidson would help pay for it.  (Tr. 50-51, 53, 75).  Lt. Davidson told Brittany's mother that he could sign her up as a confidential informant and pay her for the information, but that never materialized.  (Tr. 51, 75-77).  Lt. Davidson asked Sorgatz if she had seen anyone break the windows or knew who broke her windows, and she said no.  (Tr. 54, 77-78).

During cross-examination, Lt. Davidson testified that he did not include in the application for the warrant the information that defendant had an argument with Brittany the night before, or that he had threatened to kill her.  (Tr. 58).  In addition, while Brittany had admitted being present with defendant when he had dealt drugs in the past, she never said that she dealt them herself, that she ever assisted defendant in bagging drugs, or that she sold drugs for defendant.  (Tr. 59).

Deputy Anthony Adams testified next at the hearing on July 1, 2008.  (Tr. 79).  On November 4, 4007, Deputy Adams was called to back up the Drug Task Force on a search warrant; he arrived at the scene at about 5:30 p.m., after the search warrant had already been executed.  (Tr. 79-80).  Deputy Adams stayed with defendant at the squad car of Deputy Anderson until he was taken to jail.  (Tr. 80).  Deputies Adams and Anderson allowed the defendant out of the squad car because he was acting very

distraught, crying, and said he needed to throw up.  (Tr. 81).  They walked the suspect over to the curb area and set him down on his knees on the curb and he vomited. (Tr. 81).  Afterward, they stood him back up, and he was still crying and distraught and talking about losing his child.  (Tr. 81, 87).  As they stood him up from the curb and were wiping his mouth with a towel, defendant stated that "whatever they found in there is all mine."  (Tr. 82-83).  Deputy Adams had only asked defendant if he was doing okay when defendant made the statement to him.  (Tr. 83).  Deputy Adams had not given defendant his Miranda rights and did not know if anyone had done so.  (Tr. 83).  At the time defendant made this statement, Deputy Adams had not yet seen Lieutenant Davidson at the scene; however, right after Deputy Adams stood defendant up from the curb, Lt. Davidson came over to the squad car where Deputy Adams was standing with defendant.  (Tr. 82, 90).  Lt. Davidson spoke to defendant but Deputy Adams did not overhear their conversation.  (Tr. 82).  After Lt. Davidson and defendant spoke, defendant threw up again.  (Tr. 86).  Deputy Adams reported defendant's statement to Lt. Davidson, who told him to write a report on what the statement was.  (Tr. 83).

Deputy Nicholas Cesafsky, a custody officer at the jail in Blue Earth County, also testified at the hearing.  (Tr. 91).  His duties included general intake of the prisoners as they came in from arrest and the general well-being of inmates being housed there. (Tr. 92).  He also assesses the demeanor of inmates to see if they have been drinking in order to determine where the inmate should be housed in the jail.  (Tr. 92)

Deputy Cesafsky was working the evening defendant was brought to the jail. (Tr. 93).  He conducted a pat search of defendant and noticed that he had been crying, seemed to be hyperventilating, and was trying to speak but could not.  (Tr. 93). Because Deputy Cesafsky was informed that defendant was not feeling well, they went

to a restroom area where defendant used the facilities, and Deputy Cesafsky asked defendant if he had been drinking alcohol or using drugs that would cause him to be sick.  (Tr. 94).  Defendant replied stating that he had smoked some marijuana that day and taken ecstasy the night before.  (Tr. 94-95).  As Deputy Cesafsky and defendant proceeded back to the interrogation room where defendant would be interviewed, defendant stated that he was nervous about the charges; when Deputy Cesafsky told him he did not know what the charges were, defendant stated "they had just raided his baby's momma's crib and they were going to find some shit."  (Tr. 96).  Deputy Cesafsky did not given defendant a <u>Miranda</u> warning.  (Tr. 97).  Deputy Cesafsky stated that he was not questioning defendant, and that defendant had no hesitation in providing him any of this information.  (Tr. 98).

Elizabeth Sorgatz testified that she was friends with Jessica, the mother of defendant's baby.  (Tr. 99).  On November 4, 2007, Sorgatz went to the Mankato Police Station with Brittany and her mother because someone had thrown a rock through her window; Brittany's mom had called and thought it was defendant, but Sorgatz thought it was someone else.  (Tr. 100, 108-109).  Sorgatz wanted to press charges against whoever broke the window.  (Tr. 108).  Brittany's mother asked to speak with Lt. Davidson.  (Tr. 100).  When Lt. Davidson arrived, another officer was asking questions of Brittany.  (Tr. 101).  The other officer asked Brittany whether or not she had seen defendant with any dope or if she had seen him with any guns; he told her that they had been trying to get defendant on plenty of occasions, but defendant had never sold to an undercover agent, so they could never get any information.  (Tr. 102-103).  Brittany stated that she went to defendant's house that morning and saw him bagging up dope.  (Tr. 103).  Sorgatz did not recall Brittany telling Lt. Davidson that she was

upset with defendant.  (Tr. 104).

Sorgatz testified that Brittany requested Lt. Davidson assist her in getting her license back and getting some assault charges dropped.  (Tr. 104-105).  Sorgatz indicated that she said nothing during the conversation with Lt. Davidson or with the other officer.  (Tr. 111-112).  Sorgatz testified that Lt. Davidson asked Brittany multiple times whether she had seen anything in defendant's possession and told Brittany she needed to tell the truth, and if she was not really there, he needed to know that; according to Sorgatz, Brittany kept giving him the same answers.  (Tr. 123-124).

Sorgatz stated that she knew Brittany was not at defendant's house because Brittany had called her from Brittany's mother's house in the morning, and then called Sorgatz in the afternoon and said she was on her way from New Ulm to Mankato.  (Tr. 115).  Sorgatz knew Brittany was calling from Brittany's mother's house because the phone number on caller ID was from Brittany's mother's house; later, the caller ID showed that Brittany was calling from her cell phone.  (Tr. 121).  Sorgatz did not tell the police officers about the phone calls from Brittany that day.  (Tr. 115).  Sorgatz never told Lt. Davidson or the other officer that she believed that Brittany was not at defendant's home that morning.  (Tr. 124).

Sometime after they had been at the police station on November 4, 2007, Sorgatz talked to Brittany and Brittany said she had lied at the police station.  (Tr. 117).  Based upon that conversation, Sorgatz wrote a statement on December 22, 2007, about what she recalled from November 4th incident, and provided it to defense counsel.  (Tr. 106, 117).  See Def. Ex. 1.  Sorgatz said she wrote the statement at the request of defendant's girlfriend, Jessica, who asked her to write it for defendant's lawyer, and that she was trying to help defendant.  (Tr. 107).  Sorgatz stated that it was not until Brittany

said she had lied that she wrote the letter.  (Tr. 119).

## II.    ANALYSIS

### A.    Motion to Suppress Evidence

Ordinarily, searches pursuant to a warrant are reviewed to determine if there was probable cause for the search in the search warrant application and affidavit.  Illinois v. Gates, 462 U.S. 213, 236 (1983).  "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place."  United States v. Fladten, 230 F.3d 1083, 1085 (8th Cir. 2000).

The task of a court issuing a search warrant is "simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit . . . including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."  Gates, 462 U.S. at 238.  In reviewing the decision of the court issuing the search warrant, the duty of the reviewing court is simply to ensure that the issuing court had a substantial basis for concluding that probable cause existed.  Id. at 238-39 (citation omitted).

"A facially sufficient affidavit, however, may be challenged on the ground that it includes deliberate or reckless falsehoods, Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), and this rule has been extended to allow challenges to affidavits based on alleged deliberate omissions. E.g., United States v. Dennis, 625 F.2d 782 (8th Cir.1980)."  United States v. Reivich, 793 F.2d 957, 960 (8th Cir. 1986).

In order to obtain an evidentiary hearing to determine whether a search warrant should be invalidated (i.e. "Franks hearing"), defendant must make a substantial preliminary showing through an offer of proof (in the form of supporting affidavits or similarly reliable statements) that (1) the affidavits supporting the search warrant contained false information or an omission that was intentionally or recklessly excluded; and (2) deletion of the false information and inclusion of the omitted information negates a finding of probable cause.  See United States v. Williams, 477 F.3d 554, 558 (8th Cir. 2007).   Allegations of negligence or innocent mistake are insufficient to warrant a Franks hearing.  Id. citing to Franks, 438 U.S. at 171.

In this case, defendant moved to suppress the evidence obtained from his residence on grounds that the search warrant was issued in violation of the principles set forth in Franks.  See Def. Mem. in Support of Motion for Frank's Hearing.  [Docket No. 16].  In support of his motion, defendant proffered Sorgatz's written statement.  In this statement, Sorgatz represented that Brittany had lied about being at defendant's home on November 4, 2007, and had lied about defendant's past involvement with drugs.  Additionally, Sorgatz set forth what Brittany had told the officers regarding her observations of defendant's drug dealings that day and in the past, and Brittany's request for assistance with regard to her own criminal matters.

After reviewing defendant's proffer of evidence, this Court found that a Franks hearing was appropriate based on the written statement of Sorgatz.  The basis of the finding was that Sorgatz's written statement suggested that Lt. Davidson knew at the time that he submitted his affidavit that Brittany had not made statements against her penal interest, and at the same time, he omitted information that may have indicated to the reviewing judge that she had a motive to lie, including her fight with defendant the

night before and request for assistance with her own outstanding criminal matters.  (Tr. 15-21.)

Having granted and held the <u>Franks</u> hearing, now the issue before this Court is whether defendant has established by a preponderance of evidence that a <u>Franks</u> violation has occurred, <u>i.e.</u>, whether Lt. Davidson (1) knowingly and intentionally, or with reckless disregard for the truth, included false information in or excluded material information from the search warrant affidavit; and if so, whether (2) the affidavit, excluding the false statements or including the missing material information, would not support a finding of probable cause.  See <u>Franks</u>, 438 U.S. at 156-56; <u>United States v. Williams</u>, 477 F.3d 554, 557 (8th Cir. 2007) (citations omitted);<u>United States v. Davis</u>, 471 F.3d 938, 946 (8th Cir. 2006) (citations omitted); <u>United States v. Clapp</u>, 46 F.3d 795, 799 (8th Cir. 1995) (citations omitted).

The test for determining whether an affiant's false statements were made with reckless disregard for the truth is "whether, viewing all of the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported."  <u>Clapp</u>, 46 F.3d at 801. (citation omitted).  With respect to omissions, "'recklessness may be inferred from the fact of omission of information from an affidavit ... only when the material omitted would have been 'clearly critical' to the finding of probable cause.'"  <u>Williams</u>, 477 F.3d at 559 (citation omitted); <u>United States v. Ozar</u>, 50 F.3d 1440, 1445 (8th Cir. 1995) (quoting <u>Reivich</u>, 793 F.2d at 961); <u>United States v. Flagg</u>, 919 F.2d 499, 501 (8th Cir. 1990) ("Omissions of facts are not misrepresentations unless they cast doubt on the existence of probable cause.").  Rather than impose an objective standard for determining whether an affiant has recklessly disregarded the truth, courts "looked to what the

affiant 'believed or appropriately accepted' as true." See Clapp, 46 F.3d at 800 (quoting

United States v. Leuth, 807 F.2d 719, 726 (8th Cir. 1986) (citations omitted)).

With these principles in mind, the Court addresses defendant's contention that

Lt. Davidson intentionally or recklessly omitted material information and submitted a

material false statement in the warrant application.

The portions of the affidavit with which defendant takes issue are as follows:

> On Sunday 11-4-07 your Affiant met with a confidential informant who has personal knowledge of Marcus Devon Smith and was with Smith on today's date at XXXX Eastport where Smith lives with Jessica Lowe. The confidential informant told your Affiant he/she saw Marcus Smith weighing cocaine and placing it in small bags for sale. The confidential informant further told your Affiant that they witnessed Smith taking cocaine from a large bag (approximately the size of a softball) and placing the cocaine in smaller corner cut baggies to sell. The confidential informant told your Affiant he/she has seen Smith with cocaine numerous times in the past and has been with Marcus Smith numerous times when Smith deals cocaine which goes against the informant's penal interest.
>
> Your Affiant has personal knowledge that Marcus Smith has been arrested numerous times for narcotics sales and possession.
>
> Your Affiant has personally made a controlled substance purchase from Marcus Smith during the last year using a different CI for which Smith has not yet been charged.
>
> Your Affiant also has knowledge that Smith was arrested in January 2007 and found in possession of over $ 3,000.00 cash. The money was seized and run in the National Guard Ion scanner and registered high for the presence of cocaine and marijuana.

Gov't Ex. 2.

Defendant first contended that Lt. Davidson lied or acted with reckless disregard

for the truth when he made the representation that Brittany had made a statement

against her penal interest.  Def. Post-Hearing Mem., p. 9.

Lt. Davidson testified that he included the statement that Brittany was providing the information against her penal interest because Brittany basically had admitted to being involved, at least on a minor conspiracy level, to defendant's sale of cocaine. (Tr. 37).  In this regard, Lt. Davidson stated that Brittany had indicated she was present when defendant was selling cocaine.  (Tr. 37-38).  At the same time, Lt. Davidson testified that while Brittany had admitted being present with defendant when he dealt drugs in the past, she never said that she had dealt them herself, that she ever had assisted defendant in bagging drugs, or that she had sold drugs for defendant.  (Tr. 59).

This Court concludes that Lt. Davidson's statement that Brittany was providing information against her penal interest amounted to negligence or a mistake at most, but it did not rise to level of a false statement, much less one that was made with reckless disregard for the truth.   Neither mere negligence nor an innocent mistake will, by themselves, void a warrant.  Davis, 471 F.3d at 946 (citing Franks, 438 US. at 471; Clapp, 46 F. 3d at 799).  As a preliminary matter, the fact that Brittany did not indicate a greater level of involvement with defendant's drug dealing does not mean that she could not have been criminally liable for her presence. At the very least, it suggested her complicity and the possibility that she could have assisted at one point or another and been charged with a related crime.  See e.g. United States v. O'Connell, 841 F.2d 1408, 1425 (8th Cir. 1988) ("although mere presence or association with a person who controls drugs is insufficient by itself to prove possession, both are circumstantial evidence of possession."); United States v. Graham, 548 F.2d 1302, 1308 (8th Cir. 1977) ("[the informant's] tip contained a statement against penal interest as he admitted that he had accompanied [co-defendant] to Chicago on previous occasions for the purpose

of securing heroin…").

More importantly, however, the basis for Lt. Davidson's characterization of Brittany's statements was all contained within the affidavit for the reviewing judge to see. Lt. Davidson explicitly informed the judge: "The confidential informant told your Affiant he/she has seen Smith with cocaine numerous times in the past and has been with Marcus Smith numerous times when Smith deals cocaine which goes against the informant's penal interests." Gov't Ex. 2. Lt. Davidson did not overstate Brittany's involvement, or imply it was greater; he merely stated that Brittany's presence with defendant numerous times when he dealt cocaine was against her penal interest. The accuracy of the statement was there for the reviewing judge to consider.

Furthermore, the Court finds that even if the statement that Brittany was providing information against her penal interest was removed from the affidavit, her credibility would not have been diminished and probable cause would still exist. The reviewing judge had the information that Brittany had been present when defendant sold drugs in the past, as well as her first-hand observations of defendant's conduct at his home and the drugs within in it from earlier that same day. See Adams v. Williams, 407 U.S. 143, 146-47 (1972) (finding that the credibility of the informant is enhanced when the informant is subject to immediate arrest for making a false complaint); United States v. Solomon, 432 F.3d 824, 827 (8th Cir. 2005) (finding sufficient probable cause where informant had personally discovered evidence of a crime and provided police with a detailed description) (citing Florida v. J.L., 529 U.S. 266, 270 (2000)) (explaining that "a known informant . . . can be held responsible if her allegations turn out to be fabricated") and citing United States v. Jackson, 898 F.2d 79, 81 (8th Cir. 1990) (finding adequate basis of informant's knowledge where anonymous informant's tip provide the

"richness and detail of a first hand observation"); <u>United States v. Gabrio</u>, 295 F.3d 880, 883 (8th Cir. 2002) (concluding that an informant's information was reliable in part because "[t]he tip here was timely and 'based on the informant's first-hand observations, not merely from rumor or innuendo,'" and the affiant "had an opportunity to assess the informant's credibility because he gave his tip in person.") (citations omitted); <u>United States v. LaMorie</u>, 100 F.3d 547, 553 (8th Cir. 1996) ("personal contact with an informant can strengthen an officer's decision to rely on the information provided"); <u>United States v. Williams</u>, 10 F.3d 590, 594 (8th Cir. 1993) (finding informant's information credible because it was based on his first-hand observations, not merely from rumor or innuendo."). Knowing that Lt. Davidson had just personally met with Brittany, combined with the richness and detail of her observations that day, was sufficient for the reviewing judge to determine that her information was reliable and credible.

Defendant next argued that Lt. Davidson acted with reckless disregard for the truth when he intentionally omitted material information regarding Brittany's motives to lie from the warrant application. Def. Post-Hearing Mem., p. 11. Specifically, defendant contended that Lt. Davidson should have included the information that (1) Brittany had been involved in an ongoing relationship with defendant; (2) Brittany and defendant had an argument the night before; and (3) that Lt. Davidson assumed Brittany was speaking to him because of the argument they had the night before. <u>Id</u>.

The Court finds that the omission of these facts did not rise to the level of a <u>Franks</u> violation, because the missing information was not clearly critical to the finding of probable cause. "[A]n affidavit's omission of an informant's motive for providing information [is not] necessarily essential to a probable cause determination, especially

17

when the informant is sufficiently reliable that probable cause would have been found even if the motive were included." United States v. Taylor, 471 F.3d 832, 840 (7th Cir. 2006). Here, as discussed above, Brittany's information was supported by the fact that she was a known informant reporting to Lt. Davidson in person, and that she had made a first-hand observation of what she was reporting.

In Lombardi v. City of El Cajon, the Ninth Circuit was faced with a warrant affidavit that contained several informants (identified as CIs). 117 F.3d 1117 (9th Cir. 1997). The warrant application omitted information that CI-1 was defendant's former girlfriend who was mad at him; that CI-2 was CI-1's 17-year-old son who was in jail on charges brought by defendant and who disliked defendant; and that another informant had been tipped to talk to CI-1 and CI-2 by CI-1's sister, whose son was also facing a felony charge for his role in the burglary of defendant's house. Id. at 1126-1127. The Ninth Circuit held that given other indicia of reliability for the informants' information was present, such as the statements were detailed as to quantity of drugs and money, and were based on personal observation and recounted different things about the defendant's drug activities, the hostility of the various informants would not have been a material omission under established law. Id. at 1127.

The same is true here. The reviewing judge was presented with information that Brittany, the CI, had personal knowledge of defendant, that she had provided personal knowledge and first-hand observations from that same day, and that she had seen defendant with cocaine numerous times in the past and had been with him when he dealt cocaine. "[E]ven if we entertain some doubt as to an informant's motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand, entitles his tip to greater weight than might otherwise be

18

the case." <u>Gates</u>, 462 U.S at 234.  Further, Lt. Davidson testified that he had no reason not to believe Brittany.  (Tr. 69).  There is nothing in the record to suggest that Lt. Davidson "entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." <u>Clapp</u>, 46 F.3d at 801.

The Court also finds that had the omitted information been included in the affidavits (<u>i.e</u>. that Brittany had a relationship with defendant and that she had an argument with defendant the night before), this information would not have changed the reviewing judge's probable cause analysis.  While a judicial officer may have found it interesting or useful to know what prompted a confidential informant to come forward with information, at the end of the day, the probable cause analysis is first driven by the substance of what the informant provided and then second, by the indicia of reliability and corroborative information provided in the affidavit to satisfy the reviewing judge "that there is a fair probability that contraband or evidence of a crime will be found in a particular place." <u>Gates</u>, 462 U.S. at 238.  In this case, knowing why Brittany provided information was not critical to that analysis.

Finally, even if this Court had determined that Lt. Davidson's statements and omissions about Brittany constituted a reckless disregard for the truth, and the omitted information was included and the false statement was stricken from his affidavit, contrary to defendant's argument that the affidavit would fail because it contained only stale information and lacked independent corroboration of Brittany's information, (Def. Post-Hearing Mem., pp. 12-14), this Court finds that the remaining affidavit is supported by probable cause.

If the statement about Brittany's penal interest is removed, and information regarding her motives added, that portion of the affidavit would read as follows:

On Sunday 11-4-07 your Affiant met with a confidential informant who has personal knowledge of Marcus Devon Smith and was with Smith on today's date at XXXX Eastport where Smith lives with Jessica Lowe.   The confidential informant told your Affiant he/she saw Marcus Smith weighing cocaine and placing it in small bags for sale.   The confidential informant further told your Affiant that they witnessed Smith taking cocaine from a large bag (approximately the size of a softball) and placing the cocaine in smaller corner cut baggies to sell.   The confidential informant told your Affiant he/she has seen Smith with cocaine numerous times in the past and has been with Marcus Smith numerous times when Smith deals cocaine ~~which goes against the informant's penal interest.~~   <u>The confidential informant is Smith's girlfriend.  The confidential informant had an argument with Smith last night and is presently upset with Smith.   Your affiant assumes the confidential informant is providing this information about Smith because she is angry with him about the argument.</u>

Regarding defendant's assertion of staleness, "[p]robable cause must exist when a warrant is issued, not merely at some earlier time."   <u>LaMorie</u>, 100 F. 3d at 544 (citations omitted).   "There is no bright-line test for determining when information is stale. Whether the averments in an affidavit are sufficiently timely to establish probable cause depends on the particular circumstances of the case, and the vitality of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts supplied and the issuance of the affidavit."   <u>United States v. Koelling</u>, 992 F.2d 817, 822 (8th Cir. 1993) (citing <u>United States v. McCall</u>, 740 F.2d 1331, 1336 (4th Cir. 1984)).   Thus, "the lapse of time is least important when the suspected criminal activity is continuing in nature and when the property is not likely to be destroyed or dissipated." <u>United States v. Horn</u>, 187 F.3d 781, 786 (8th Cir. 1999) (citations omitted).   <u>See also</u> <u>United States v. Ozar</u>, 50 F.3d 1440, 1446 (8th Cir.), <u>cert. denied</u>, 516 U.S. 871, 116 S.Ct. 193, 133 L.Ed.2d 128 (1995) ("The passage of time is less significant when there is cause to suspect continuing criminal activity.") (citations omitted).   Further,

"where recent information corroborates otherwise stale information, probable cause may be found." Id. at 1446  (quotation and citation omitted).

Here, the affidavit contains information that defendant had sold drugs during a controlled buy during the past year to affiant, that defendant had been arrested numerous times for narcotics violations in the past, and that defendant was arrested in January of 2007 after being found in possession of $3,000 cash that registered for the presence of cocaine and marijuana.   That information, coupled with Brittany's information on the same day that the affidavit issued, there was cause to suspect continuing criminal activity.  "It is well-settled that information about criminal activity at an earlier, unspecified time may combine with factually connected, recent, time-specific information to provide a substantial basis for the conclusion that the criminal activity described in an affidavit is sufficiently close in time to the search warrant application." United States v. Day, 949 F.2d 973, 978 (8th Cir.1991).  Lt. Davidson's information that defendant had been involved in drug dealing throughout the year, Brittany's information that she had seen defendant deal drugs in the past, and her information from that day that he was packaging drugs, all establish continuing criminal activity.  As such, the information regarding the controlled buy, the money that tested positive for the presence of narcotics, and defendant's earlier arrests was not stale in light of the fact that all of these pieces of information, combined with Brittany's current information, provided a reasoned and objective basis to suspect continuing criminal activity.  See United States v. Luloff, 15 F.3d 763, 767 (8th Cir. 1994) (where affidavit was considered in its entirety and showed continuous, ongoing criminal activity, information concerning defendant's participation in drug trafficking approximately one year earlier was not stale).

For the same reasons, the Court finds that the affidavit contained sufficient corroboration. When informants are used to develop probable cause to support the issuance of a search warrant,

> [t]he core question . . . is whether the information is reliable. Information may be sufficiently reliable to support a probable cause finding if the person providing the information has a track record of supplying reliable information, or if it is corroborated by independent evidence. Draper v. United States, 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327 (1959) (Draper). If information from an informant is shown to be reliable because of independent corroboration, then it is a permissible inference that the informant is reliable and that therefore other information that the informant provides, though uncorroborated, is also reliable. Gates, 462 U.S. at 233-34, 103 S.Ct. at 2329-30; Draper, 358 U.S. at 313, 79 S.Ct. at 333.

Williams, 10 F.3d at 594.

In this case, although Lt. Davidson did not have the opportunity to specifically corroborate the information that Brittany had supplied that day, Lt. Davidson did have corroborating information such as defendant's criminal history and past associations with narcotics.

"A premium is indeed placed on corroboration of the tip by independent evidence and evidence of past reliability in cases where the statements of a confidential informant provide the basis for probable cause." United States v. Carter, 413 F.3d 712, 714 (8th Cir. 2005) (citations omitted). However, Carter also suggests that corroboration may be balanced by circumstances where an informant is in fact not confidential, and instead known to an affiant, and therefore could be prosecuted if he or she made false sworn statements to the officer, and where an affiant officer dealt with an informant in person and therefore had an opportunity to assess his credibility. Id. at 714-715. Here, Brittany was known to Lt. Davidson and made her statement in person.

Additionally, the Court finds the Eighth Circuit's recent decision in United States v. Stevens to be instructive.  530 F.3d 714 (8th Cir. 2008).  In that case, the daughter of a defendant told police that the defendant had admitted to her that he sold cocaine to a man in front of their apartment building, and that the defendant had then shown her a safe inside his apartment that contained fifty to one hundred bags of cocaine. Id. at 716-717.  The daughter's half-brother also gave an in-person statement to the affiant officer, reporting that he had overheard the defendant admit to selling the cocaine but that he had not seen the transaction.  Id. at 717.  The court concluded that the information in the affidavit provided sufficient indicia of reliability to support a finding of probable cause because the defendant's daughter and her half-brother identified themselves and voluntarily provided in-person statements to the affiant officer, and because the daughter's statement detailed a first-person, eyewitness account of recent criminal activity and contraband at the defendant's home.  Id. at 718-719.  The court also found that this information was sufficiently corroborated by the affiant officer, who confirmed that two vehicles were registered to the defendant at the residence identified by his daughter, and checked the defendant's criminal history and discovered that the criminal activity and contraband alleged by the defendant's daughter were similar to the narcotics-related charges for which the defendant had been arrested several times before.  Id. at 719.

As in Stevens, Brittany provided the information to Lt. Davidson in person and voluntarily, and her statement detailed a first-person, eyewitness account of criminal activity at defendant's house.  Lt. Davidson checked defendant's criminal history and found previous similar criminal charges; furthermore, Lt. Davidson had performed a controlled buy from defendant earlier in the year and knew first-hand that defendant had

sold drugs.  The Court finds that the additional information regarding defendant's criminal history and his past involvement with drugs provided sufficient corroboration to support a finding of probable cause.

Based on the foregoing, the Court finds that Lt. Davidson's statement and omissions about Brittany did not rise to the level of a <u>Franks</u> violation, and that defendant's motion to suppress evidence seized from his residence on that basis should be denied.[2]

### B.    Motion to Suppress Statements

Defendant also filed a motion to suppress statements.  [Docket No. 14]. Defendant argued that on the day of his arrest, he provided custodial statements in response to interrogation, and that any waiver of <u>Miranda</u> was not knowing and voluntary based upon the totality of circumstances.  <u>Id</u>., p. 1.  Specifically, defendant contended that he was intoxicated and concerned that his son would be taken by child

---

[2]    Defendant's initial motion for the <u>Franks</u> hearing also included arguments that the warrant affidavit contained untruthful information, based on the statement from Sorgatz that Brittany had lied to Lt. Davidson, and that Brittany had gone to Lt. Davidson to get assistance with her pending criminal matters.  Def. Mot. for <u>Franks</u> Hearing, pp. 5, 9 [Docket No. 16].  At the hearing, Sorgatz testified that Brittany had lied about her whereabouts when she said she had been at defendant's house the morning of November 4, and had witnessed him packaging drugs.  (Tr. 103).  Sorgatz also testified that Brittany requested Lt. Davidson help her get her license back and get some assault charges dropped.  (Tr. 104-105).  While defendant's post-hearing brief mentioned in passing Sorgatz's testimony that Brittany had lied and that one of the reasons Brittany had gone to Lt. Davidson was to get help with her license (Def. Post-Hearing Brief, p. 4), defendant did not rely on those statements for his post-hearing arguments regarding the validity of the warrant.  In any event, having heard the testimony of Sorgatz and Lt. Davidson's testimony on these topics, the Court concludes that Lt. Davidson neither discussed nor promised any help to Brittany with respect to her outstanding criminal matters in exchange for the information she had provided to him regarding defendant, and that Lt. Davidson had no knowledge that Brittany was lying about her presence at defendant's residence or her observations at the residence on Nov. 4, 2007.  (Tr. 55, 61, 124).  Consequently, to the extent that defendant argued that the warrant was invalid because Brittany had lied to Lt. Davidson, or because Lt. Davidson omitted from his affidavit the information that Brittany was seeking assistance with pending criminal charges, the Court finds those arguments to be without merit.

protection, and the circumstances were such that his will was overborne and he was unable to make knowing, intelligent and voluntary decisions to waive his Miranda rights.  Id.  Defendant's post-hearing memorandum did not add further argument or support for this motion to suppress statements. See Def. Post-Hearing Mem., p. 15.

Miranda v. Arizona requires that an individual be advised of his right to be free from compulsory self-incrimination and the right to the assistance of an attorney anytime the individual is taken into custody for questioning.   Miranda v. Arizona, 384 U.S. 436, 444 (1966); see also United States v. Griffin, 922 F.2d 1343, 1347 (8th Cir. 1990).  Therefore, the protections afforded by Miranda are triggered when an individual "is both in custody and being interrogated."  United States v. Hatten, 68 F.3d 257, 261 (8th Cir. 1995) (citing United States v. Lawrence, 952 F.2d 1034, 1036 (8th Cir. 1992)).

"Custody occurs either upon formal arrest or under any other circumstances where the suspect is deprived of his freedom of action in any significant way."  Miranda, 384 U.S. at 444.  The determination of whether an individual is in custody at a particular time depends on "the extent of the physical or psychological restraints placed on the suspect during interrogation in light of whether a 'reasonable person in the suspect's position would have understood his situation' to be one of custody."  Griffin, 922 F.2d at 1347 (quoting Berkemer v. McCarty, 468 U.S. 420, 442 (1984)).

There are four separate statements at issue:  the first was to Deputy Adams outside his home; the second was to Lt. Davidson outside his home; the third was to Deputy Cesafsky at the jail; and the fourth was to Lt. Davidson at the jail.[3]  There is no

---

[3]   Defendant's pretrial motion makes no mention of the statements made by defendant to Deputy Adams or Lt. Davidson outside his home, or to Deputy Cesafsky at

dispute that defendant, who was under arrest, was in custody at the time of all four statements.

### 1.    Statement to Deputy Adams

At the time he made the statement to Deputy Adams, defendant was distraught and crying, and had just vomited at the curb.  (Tr. 81, 87).  As Deputy Adams stood defendant back up and wiped his mouth with a towel, he asked defendant if he was okay and defendant responded that whatever they found in the house was all his. (Tr. 81-83).  Deputy Adams had not given defendant his Miranda rights at that time and was unsure if anyone had.  (Tr. 83).

The Government contended that defendant's statement was spontaneous and not the result of express questioning or the functional equivalent.  Gov't Post-Hearing Mem., p. 21.  Defendant did not address this argument in his briefs.

Having already determined that defendant was in custody, the Court must next consider whether he was being interrogated.   "Interrogation" means "questioning initiated by law enforcement officers."   Miranda, 384 U.S. at 444.   The term "interrogation" is defined as "'express questioning or its functional equivalent.'  This includes 'any words or actions on the part of the police (*other than those normally attendant to arrest and custody*) that the police should know are reasonably likely to elicit an incriminating response . . .'" United States v. Henderson, 770 F.2d 724, 728 (8th Cir. 1985) (emphasis in original) (quoting Rhode Island v. Innis, 446 U.S. 291, 300-301 (1980); United States v. Hatten, 68 F.3d 257, 261 (8th Cir. 1995)).  Thus, the test for determining whether questioning is an "interrogation" within the meaning of Miranda, is whether, under all of the circumstances involved in a given case, questions are

the jail before his interview.  Nevertheless, for completeness, this Court has addressed these three statements in addition to the statement given Lt. Davidson at the jail.

reasonably likely to elicit an incriminating response from the suspect.  See Innis, 446 U.S. at 300-01.

The Court concludes that asking defendant whether he was okay was not designed to elicit an incriminating response.  It was a simple "yes or no" question, and appropriately asked, given that defendant had just been sick.  Defendant was not being interrogated, and the protections under Miranda were not triggered.  Therefore, the Court recommends that defendant's motion to dismiss the statement made to Deputy Adams be denied.

### 2.    First Statement to Lt. Davidson

To the extent that defendant is seeking to suppress the statements to Lt. Davidson outside the squad car, the Court reaches a similar conclusion.  After Deputy Adams stood defendant up from the curb, Lt. Davidson went to talk to defendant and noticed that he was bent forward looking down at the ground and looked sick to his stomach, like he was about to vomit.  (Tr. 42).  Several officers were standing next to him, and he was in custody at that time.  (Tr. 63).  Defendant was crying; Lt. Davidson could tell he was very upset and when he put his hand on defendant's shoulder, he could feel that he was shaking.  (Tr. 42).  Lt. Davidson asked him if he was going to be okay, and defendant stated that he was worried about losing his child and became very physically ill.  (Tr. 42-43).

Again, the Court concludes that Lt. Davidson's question to defendant asking whether he was okay was not designed to elicit an incriminating response.  Lt. Davidson could tell defendant was upset and that he was shaking, and he had just vomited for the second time.  Asking defendant about his condition was appropriate given the circumstances.  Therefore, the Court recommends that defendant's motion to dismiss

the statement made to Lt. Davidson that he was worried about losing his child be denied.

### 3.    Statement to Deputy Cesafsky

After defendant had been transported to the jail, Deputy Cesafsky took him to a restroom area because he was told defendant was not feeling well.  (Tr. 94).  Defendant used the facilities, and Deputy Cesafsky asked defendant if he had been drinking alcohol or using drugs that would make him sick.  (Tr. 94).  Defendant replied that he had smoked some marijuana that day and taken ecstasy the night before.  (Tr. 94-95).  As Deputy Cesafsky and defendant proceeded back to the interrogation room where defendant would be placed for an interview, defendant stated that he was nervous about the charges; when Deputy Cesafsky told him he did not know what the charges were, defendant stated "they had just raided his baby's momma's crib and they were going to find some shit."  (Tr. 96).

Again, as there is no dispute that defendant was in custody at this time, the Court must determine whether he was being interrogated.

Not all statements made while in custody are the products of interrogation.  See Innis, 446 U.S. at 299.  In this regard:

> Statements volunteered by a suspect during the course of routine arrest procedures were not the products of interrogation, and that custodial statements made on the suspect's own initiative are not subject to the safeguards of Miranda.  Miranda does not protect an accused "from a spontaneous admission made under circumstances not induced by the investigating officers or during a conversation not initiated by the officers."

United States v. Cotton, 223 F.Supp.2d 1039, 1048 (D. Neb. 2002) (quoting Butzin v. Wood, 886 F.2d 1016, 1018 (8th Cir. 1989) (internal citations omitted)).  Initiation by a

defendant occurs when the defendant evinces "a willingness and a desire for a generalized discussion about the investigation."  Holman v. Kemna, 212 F.3d 413, 417 (8th Cir. 2000).

The Court observes that Deputy Cesafsky did not in fact pose a question to defendant, but rather responded to defendant's statement that he was nervous about the charges.  Custodial statements made on the suspect's own initiative are not subject to the safeguards of Miranda.  Therefore, Miranda does not protect an accused "from a spontaneous admission made under circumstances not induced by the investigating officers or during a conversation not initiated by the officers."  Cotton, 223 F.Supp.2d at 1048 (quoting Butzin v. Wood, 886 F.2d 1016, 1018 (8th Cir. 1989) (internal citations omitted)).  Defendant initiated the topic regarding charges, not Deputy Cesafsky; therefore, his statements were not subject to the safeguards of Miranda.

Further, the Court finds that Deputy Cesafsky's question to defendant about whether he had ingested any alcohol or drugs was not designed to elicit an incriminating response.  Deputy Cesafsky testified that part of his job was to assess the demeanor of inmates at intake to see if they had been drinking for the purpose of determining where the inmate should be housed in the jail.  (Tr. 92).  The Court finds that his question to defendant was asked for the purpose of organizing housing for defendant while he was at the jail, and to assess his physical condition.  Questions necessary to complete processing that are not designed to elicit incriminatory admissions are exempted from the Miranda requirement.  See Pennsylvania v. Muniz, 496 U.S. 582, 601-02 (1990).  See also United States v. Linderman, 2008 WL 199913 at *3 (D.Minn. Jan. 22, 2008) (J. Davis) (question during booking process as to whether defendant was suicidal found not to be interrogation because it was a routing booking question pertaining to

prisoner's physical and mental health in an effort to provide appropriate medical care).

For all of these reasons, the Court recommends that defendant's motion to suppress the statements to Deputy Cesafsky be denied.

### 4.    Statement to Lt. Davidson at the Police Station

Lastly, defendant moved to suppress the statements he made during his interview with Lt. Davidson and Agent Peterson at the police station after he was arrested, and following the administration of the Miranda rights to him.   Defendant argued that any waiver of his Miranda rights was not knowing and voluntary due to his intoxicated state and his concern that his child would be taken by child protection.   Def. Mot. to Suppress Stmts., p. 1.

As a preliminary matter, the Court notes that there is no dispute that defendant was in custody at the time the statements were made, and that he was therefore entitled to a reading of his Miranda rights.   Further, it is evident from the record that defendant was properly given his Miranda rights.   Tr. 45; Gov't Ex. 1.   Thus, the only issue that remains for determination is whether defendant validly waived those rights.

A waiver of Miranda rights is valid if it satisfies the following criteria:   "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.   Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."   United States v. Turner, 157 F.3d 552, 555 (8th Cir. 1998) (citing United States v. Jones, 23 F.3d 1307, 1313 (8th Cir. 1994)).   "The determination of whether an accused has knowingly and voluntarily waived his Miranda rights depends on all the facts of each particular case." Stumes v. Solem, 752 F.2d 317, 320 (8th Cir. 1985) (citing Fare v. Michael C., 442 U.S.

707, 724-25 (1979)).   Only if the "'totality of the circumstances surrounding the interrogation'" reveals both an uncoerced choice and the requisite level of comprehension may this Court properly conclude that the defendant's <u>Miranda</u> rights have been waived.   <u>See</u> <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986) (quoting <u>Fare</u>, 442 U.S. at 725).

A recording of defendant's interview was submitted to the Court as Government's Exhibit 1.   The Court has listened to that interview in its entirety.   Defendant's interview was relatively brief, lasting under ten minutes.   At the beginning of the interview, Lt. Davidson told defendant what they had found during the execution of the search warrant, and then read defendant his <u>Miranda</u> rights.   Defendant acknowledged that he understood his rights and then agreed to talk to Lt. Davidson.[4]   At no time during the interview did defendant indicate that he was uncomfortable or that he needed anything. The circumstances surrounding defendant's interview were not coercive or intimidating in any manner.

Further, there are no facts before the Court to indicate that defendant's waiver was not the product of free choice, and defendant has offered nothing to suggest that his <u>Miranda</u> rights were waived involuntarily, or that he was coerced into the waiver. While defendant submitted that he was worried about losing his child to child custody, the Court notes that Lt. Davidson testified that defendant's girlfriend, the mother of the child, arrived home and the police left the child with her.   In any event, concern about

---

[4]        On the recording, after Lt. Davidson reads defendant his <u>Miranda</u> rights, defendant's acknowledgement of those rights is not audible.   However, Lt. Davidson next asks defendant "Okay, with those rights in mind, do you want to talk to me now, Marcus?" and defendant audibly agrees.   Because Lt. Davidson's question would only logically follow an affirmative acknowledgement by defendant of his rights, and because defendant proceeded to speak with Lt. Davidson, the Court has concluded that defendant acknowledged his rights despite the fact that his response cannot be heard.

the implications of one's conduct, including loss of the custody of a child, while certainly understandable, does not amount to coercion by law enforcement or render a waiver of rights involuntary.   Additionally, although defendant may have been sick prior to the interview with Lt. Davidson, plaintiff spoke clearly and coherently throughout the interview, and never stated to Lt. Davidson that he was sick or that he needed to stop. As such, the Court does not find that the fact defendant was not feeling well prior to the interview is a basis for concluding that his waiver of Miranda was involuntary.

Defendant also suggested that he was intoxicated during the interview and therefore was unable to provide a knowing and voluntary waiver of Miranda.   Def. Mot. to Suppress Stmts., p. 1.   "Sleeplessness, alcohol use and drug use are relevant to [the voluntariness] analysis, but '[i]ntoxication and fatigue do not automatically render a confession involuntary.'"   United States v. Gaddy, 532 F.3d 783, 788 (8th Cir. 2008) (quoting United States v. Casal, 915 F.2d 1225, 1229 (8th Cir. 1990)).   "Instead, 'the test is whether these mental impairments caused the defendant's will to be overborne.'" Id. (citation omitted).   It is true that Deputy Cesafsky testified that defendant informed him that he had taken ecstasy the night before and had also smoked marijuana. However, the recording of the interview indicated that defendant was lucid at the time of the interview.   Lacking any testimony or evidence that defendant appeared intoxicated or impaired, the Court finds that he had no mental impairments that caused his will to be overborne.   See United States v. Contreras, 372 F.3d 974, 977 (8th Cir. 2004) (court found that a suspect who used methamphetamine the evening before and marijuana the day he waived his rights consented voluntarily because police officers testified he appeared "sober and in control of his facilities.").

For the foregoing reasons, the Court recommends that defendant's motion to

suppress statements be denied.

## **RECOMMENDATION**

For the reasons set forth above, it is recommended that:

1.      Defendant Marcus Devon Smith's Motion to Suppress Statements Due to Involuntariness of Statement and Involuntary Waiver of <u>Miranda</u> Rights [Docket No. 14] be denied; and

2.      Defendant Marcus Devon Smith's Motion for <u>Franks</u> Hearing, or an Evidentiary Hearing Challenging the Truthfulness and Accuracy of the Application in Support of Search Warrant [Docket No. 15] be granted.

3.      Defendant's Motion to Suppress Evidence Obtained Pursuant to Search Warrant [Docket No. 28] be denied.

Dated:      August 26, 2008

*s/ Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties on or before September 12, 2008 a copy of this Report, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.